3-0-9-0-4-4-3, the people of the state of Illinois, an apple leaf by Gary David, v. Tecumseh Green, counseled by Brian Kohut. Go ahead. May it please the court. Good afternoon, your honors. Counsel, my name is Brian Kohut, and I represent Ms. Tecumseh Green, the defendant in this criminal case. Following a jury trial in the Circuit Court of Peoria County, Ms. Green was convicted of knowing first-degree murder and sentenced to 34 years in prison. In her brief on appeal, Ms. Green raises two issues. Today, she would like to focus on the first issue, whether the Circuit Court erroneously allowed evidence of a prior incident between Ms. Green and the victim, Montrell Fleming. Your honors, factually, in June 2007, Tecumseh Green and Montrell Fleming were living together with their infant child. Latasha Robinson, Fleming's cousin, also lived in the home with her young child, McHale. On June 5th, Latasha and Ms. Green went to the store. After they returned, Latasha heard Ms. Green ask McHale if she'd picked up any money. Fleming and Green started to argue. Latasha and McHale went outside and got in the car to wait for Fleming while the two argued. Fifteen to thirty minutes later, McHale was sent in to see what was taking so long. McHale and Fleming came running out and both indicated that Green had stabbed Fleming. McHale Robinson testified that Green and Fleming were arguing about money. From the living room, McHale saw Ms. Green standing by the sink and Fleming was standing by the stove facing her. Green had the phone to her ear and Fleming was asking why she was calling the police. Fleming grabbed the phone and Ms. Green stabbed him in a downward motion. Ms. Green testified that their argument started when Latasha yelled at her for accusing McHale of taking money. Ms. Green told Fleming that she wanted Latasha to move out. Green and Fleming argued. Fleming stopped Ms. Green as she was trying to leave and eventually backed her up against the sink. He grabbed for her phone and started to choke her. Green grabbed a knife from the sink and she stabbed him. Your Honors, the circuit court allowed evidence of a prior incident between Montrell Fleming and Tecumseh Green to show Ms. Green's intent, motive, modus operandi, and general attitude towards Fleming. Fleming's brother testified that in June 2005, Green and Fleming got into an argument. Ms. Green grabbed a knife that was in the bedroom and began cutting Fleming's clothes. Fleming became angry and smashed Green's living room table. Green came at Fleming wildly swinging the knife. There was a struggle and the two were separated. Fleming left the residence. Ms. Green picked up a knife and went outside. A second melee ensued. Fleming's brother cut his pinky finger while grabbing the knife and they were separated again. Green threw a piece of glass at Fleming. Fleming got angry and came back at Green. And a third melee ensued that was eventually broken up. Green was charged with misdemeanor offenses but the charges were dropped when Fleming failed to appear. Your Honors, the circuit court erroneously admitted the evidence of the 2005 incident because the prior incident was not appropriately relevant to the jury's determination of whether Ms. Green stabbed Fleming knowing such act created a strong probability of death or great bodily harm or whether Ms. Green acted in self-defense. Because the evidence of the 2005 incident was irrelevant, the prejudicial effect of this evidence substantially outweighed its probative value. Therefore, Takunji Green's conviction should be reversed and his cause should be remanded for a new trial. First, the evidence of the prior incident was not admissible to show modus operandi. Ms. Green admitted to stabbing Fleming. She claimed self-defense. Therefore, proving the identity of the assailant, the purpose underlying the admission of modus operandi evidence was not in question. Second, the evidence was not appropriately admissible to show Ms. Green's intent. Ms. Green was charged with stabbing Montrell Fleming knowing such act created a strong probability of death or great bodily harm. She was not charged with intentional murder and as it acknowledged in closing arguments, the State was not required to prove her intent. Furthermore, in claiming self-defense, Ms. Green conceded that she intended to stab Fleming. The only appropriate relevance of her intent at the time of the stabbing was to show that it was not done in self-defense. There are two possibilities where evidence of the 2005 event showed that Ms. Green did not act in self-defense in 2007. Either she intended to kill Fleming all along or the 2005 event showed that she did not reasonably or unreasonably believe self-defense was necessary in 2007. First, the 2005 incident is simply too remote to show that her intent carried through to 2007. Two incidents occurred two years apart in separate residences. More importantly to the question of intent, there were intervening circumstances. After the 2005 incident, the two broke up and Ms. Green moved back in with her mother. Later, the two started dating again. Fleming moved in with Green and her mother. Then, Fleming and Green moved into a house and had a child together. The incidents were simply too remote and there were too many intervening circumstances to show a continuous intent to kill from 2005 to 2007. Second, Your Honors, if her intent was independently formulated in 2007, then in order to be appropriately relevant, the 2005 event would have to predict and explain the 2007 behavior. In other words, there would have to be some relationship between the two events such that the 2005 event would show the state of mind accompanying the 2007 incident. However, the two sets of facts are insufficiently alike for the 2005 incident to show that Ms. Green was not acting in self-defense in 2007. Here, in 2005, Ms. Green was the aggressor. After Fleming smashed her table, Green came at him wildly swinging a knife that she had been carrying for a considerable portion of the argument. In 2007, however, by all accounts, Green was backed up against the sink and was attempting to call for help. Furthermore, the cut in 2005 was unintended, resulting in an injury to a third party, but the stab in 2007 was intended. Finally, and most importantly, Ms. Green did not claim self-defense in 2005, nor could she where Fleming's brother was cut unintentionally. The behavior in the two incidents is just too dissimilar for the 2005 incident to negate the 2007 self-defense claim. Third, evidence of the 2005 incident was not admissible to show motive. Motive is the reason why a defendant commits an act. Ms. Green's motive for stabbing Fleming was self-defense, and the 2005 incident does not give rise to a motive or reason for her to commit the 2007 offense. The single isolated incident did not establish the type of situation such as that in Ilgin, where the defendant repeatedly and violently battered his wife. In Ilgin, the defendant was charged with intentional murder. However, he claimed the shooting was an accident. The other crimes evidence, a long-standing history of violent physical attacks against the victim, was appropriately admissible to show that the victim's murder was not an accident. In discussing motive, and this is the entire discussion of motive in the Ilgin case, the court stated, in addition to evidencing intent or the absence of an innocent state of mind, a defendant's prior acts of violence against the victim may also provide evidence of motive, in this case, a hostility showing him likely to do further violence. The evidence that the defendant physically assaulted his wife throughout their marriage was relevant to show their antagonistic relationship and thus tended to establish the defendant's motive to kill her. In this case, however, there was only one prior incident. This prior act was simply insufficient to show that Miss Green was motivated by a hostility showing her likely to do further physical violence. One prior act does not show a physically antagonistic relationship. Furthermore, the facts do not show the one-sided hostility that occurred in Ilgin. Rather, the 2005 incident involved mutual combat between Fleming and Green resulting in an injury to a third party. Ilgin is therefore readily distinguishable, and there is no other potential motive in this case. Fourth, evidence of the 2005 incident should not have been admitted to show Miss Green's general attitude toward the victim. General attitude toward the victim amounts to nothing more than a veiled substitute for propensity. Coupled with the facts of the prior incident, the jury would understand that Miss Green had a tendency to come at Fleming with a knife. The jury would understand that Miss Green... Oh, I'm sorry. In other words, she had come at Fleming with a knife before and given her disposition or general attitude toward him, she would do it again. In short, the past incident coupled with her general attitude toward the victim would only show that she was the type of person who would commit the incident offense because she had done it before. Thus, even if the evidence of the 2005 event was properly introduced to show motive or intent, the jury was allowed to consider it as propensity evidence when it was repeatedly instructed that it could consider the 2005 incident for the purpose of showing Miss Green's general attitude toward Fleming. Finally, the prejudicial effect of the jury hearing about a prior incident where Miss Green came at Fleming with a knife is clear and substantial. As argued here, the 2005 incident had little or no probative value where it was not appropriately relevant. Consequently, the prejudicial effect of this prior incident substantially outweighed its probative value, likely leading to a guilty verdict because the jury saw Miss Green as a bad person deserving punishment. There are no questions? I guess not. Thank you, Mr. Clark. Thank you. And Mr. Benitovic? May I please, Clark, counsel? First of all, I'm not going to take and stand before the court and try to take and correct everything that I believe is wrong with the defendant's argument. This court is going to decide this case on how it interprets the facts. I am going to take and say just a couple of things factually with respect to what was said. First of all, with respect to the testimony of Mykeel Robinson. Mykeel Robinson, according to my notes, at record 429 and 432 and 433, indicated that she saw the victim standing by the sink. She saw the defendant standing by the sink. She saw the victim standing by the stove. And, indeed, the victim did say, why are you calling the police? However, the victim never grabbed the phone. In the process of reaching for the phone is when Mykeel says that she thought the defendant hit the victim with a hairbrush. It wasn't until after she saw that he was bleeding that, in fact, she realized he had been stabbed. And it's a crucial fact because the way that everything has been portrayed here, saying that the defendant was backed up against the sink and that the victim was coming at her and the victim grabbed the phone, et cetera, et cetera, okay, is not the picture that was painted by the sole eyewitness. They were arguing, no symbolic. And at the time, the victim merely reached for the phone. Defendant stabbed her. Now, what did the defendant say? Well, the defendant argued and said that the defendant admitted stabbing. Well, subsequently, she did. But at first, she merely said, I grabbed something. Didn't know what I was grabbing, but I grabbed something and I hit it. To get him off me, I hit him, okay? Now, if we want to take and parse words as hitting the same as stabbing, you know, I'll leave that for the court to decide. I don't think so, but do that as it may. The point is, is that what we have is we have, with respect to the other crimes evidence that was admitted, we have an argument that's been presented solely from how the defendant has interpreted the evidence. And with absolutely no analysis, no regard for the fact that the people have the burden of this case. What do we have to prove? We have to prove that the defendant knowingly committed murder. Our theory of the case is they were arguing. As a result of the argument, she became enraged. She tried calling the police or someone. He reached for the phone. She stabbed him. Now, the question is, did she do that knowing that her acts would create a strong probability of death of great bodily harm? Now, she's painted the picture that basically, well, I was defending myself. So, in an effort to take and establish what her intent was at the time, the people relied upon the other crimes evidence. What did she claim she was defending herself with? The second time in 07? When she originally talked to police and when she originally testified, and her testimony, by the way, is 673-674. She simply testified she grabbed something and hit him. Now, that to me indicates that she didn't know she had grabbed the knife. It shows that she didn't feel as though she was necessarily defending herself in the sense of using self-defense, believing that she was in a situation of great bodily harm. What she was doing is she just grabbed something and she wanted to hit him. Right? And I think that in this particular situation, if we're trying to take and divine her intent at that time, I think what we can do is I think the state can legitimately, in an effort to establish what that is, refer to evidence of the crimes. I don't see, although in Illigent, Illigent, indeed, claimed that the shooting was accidental. But in Illigent, it was pretty much the same thing. Defendant says here that the issue that's presented is whether the defendant's actions were justified because she reasonably or unreasonably believed self-defense was necessary. Well, in Illigent, the defendant testified it was an accident. So the jury had to decide, was it an accident or was it not? Here, the jury had to decide, was it self-defense or was it not? In Illigent, they relied and they allowed the admission of the prior other evidence of other crimes. And I think that the evidence in Illigent was not quite as broad-based as what defendants presented here. They didn't necessarily show 30 years of abuse. They showed abuse that happened within two or three years of them getting married, and then they showed a second incident that happened within three years of the incident, three years before the incident. They relied upon another evidence of other crimes that occurred at that time. The time frame is somewhat similar as here. And what they were trying to take and show, what the state was trying to show was it wasn't an accident. What are we trying to establish here? We're trying to establish her intent. We're trying to establish why it is that she lashed out, why it is that she did what she did. And we were trying to take and prove that it wasn't self-defense. Now, again, if we didn't have the eyewitness testimony, then obviously we've got contradictory. We really only have the defendant's point of view. But here, in this case, we've got the 9-year-old eyewitness who's testified as to what the facts were and are, by the way, similar to at least what the defendant originally told police. Defendant, in this case, was severely impeached on cross-examination about all of the additions she made, as well as the fact of being impeached about how her conduct post-stabbing is totally inconsistent with anybody who, if you were attacked, right, once the person's gone and once you've fled to a place of safety, didn't she call police? She called her mother. When her brother and sister came and picked her up and got her to a safe place, did she call police? No. Her mother had to call police. Basically, the grand scheme of everything here is the fact that the evidence of other crimes was properly admissible on the question of intent, was permissible on the question of her motive, was admissible to establish their antagonistic relationship. Defendant chooses to say in the reply brief, well, instead of saying antagonistic relationship, we refer to it as a stormy relationship. Again, I'll leave it to the court to take equivalent of the words whether stormy is the same as antagonistic, but if it is stormy, and that's what it is, and if this is how she reacts when she gets angry, I think that is very relevant evidence on her intent. That's properly admissible under ILGEN. It is properly other crimes evidence that is admissible, and in this case, there was no error. Of course, we have argued, should this court find that there was error, we have argued that it's harmless. I think that you have to take a look at the totality of the evidence, not just the defendant's theory. And I think that even if you extract this evidence, considering the testimony of this nine-year-old girl who had nothing to gain or lose by her testimony except simply to tell the truth, in this case, we have an entirely different picture. The jury could very easily decide this case, and have decided this case, on that little girl's testimony alone. So we think that if there is any error, which we strongly urge there is not, that that error is harmless beyond a reasonable doubt. And therefore, we would ask this court to affirm the conviction. Thank you, Mr. Green. Thank you. And Mr. Kollack? Yes, Your Honor, Mr. Green. Your Honor, Mr. Green would just note that Ilgen involved multiple instances of violent physical battering against his wife. And it was over a number of years, approximately ten years, approximately a ten-year time period. Here, we only have one prior instance of physical problem. And Ms. Green discusses her relationship as a stormy relationship. They had several arguments, admittedly. However, only the one got physical prior to this 2007 event. And if there are no questions, Your Honor? Thank you. Thank you, Mr. Kollack. Thank you both for your arguments today. We will take this matter under advisement and get back to you with a written disposition within a short day. And we'll now take a recess until tomorrow morning at 9 o'clock.